IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

QUINCY DEMOND BLAKELY and    §
KIMBERLY BLAKELY,    §
   §
      Plaintiffs,    §
   §
V.    §      No. 3:16-cv-2801-K-BN
   §
JEANETTE L. KELLY, ET AL.,    §
   §
      Defendants.    §

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE**

Plaintiffs Quincy Demond Blakely and Kimberly Blakely paid the filing fee to bring this *pro se* civil rights action under 42 U.S.C. § 1983. Their action has been referred to the undersigned United States magistrate judge for pretrial management under 28 U.S.C. § 636(b) and an order of reference from United States District Judge Ed Kinkeade.

Based on Mr. Blakely's then-ongoing state misdemeanor prosecution, the Court stayed and administratively closed this action on November 3, 2016. *See* Dkt. Nos. 11 & 12. On May 20, 2018, Plaintiffs moved to reopen their case, attaching to that motion an order dismissing the misdemeanor prosecution against Mr. Blakely. *See* Dkt. No. 13. The Court granted their motion, and, because they paid the filing fee, directed Plaintiffs to serve their complaint by August 20, 2018. *See* Dkt. No. 14.

Plaintiffs filed an amended complaint [Dkt. No. 15] before that deadline. Several defendants filed waivers of service in September 2018. *See* Dkt. Nos. 17-24. And, on

October 8, 2018, Defendants City of Dallas, *see* Dkt. No. 26, and Officers Steve Gomez, Jr., Pamela Hampton-Bradley, Francisco J. Mireles, Fidel Padron, Robert Ramsey, Pablo Rojas, and Fernando Silva, *see* Dkt No. 27, moved to dismiss some – not all – of Plaintiffs' claims against them under Federal Rule of Civil Procedure 12(b)(6).

The Court then entered an order staying these defendants' deadline to serve responsive pleadings pending the disposition of their motions, advising Plaintiffs of the legal standards governing Rule 12(b)(6) motions, and setting response and reply deadlines. *See* Dkt. No. 30. And, although Mr. Blakely filed an emergency motion requesting that the Court enjoin "the execution of an arrest warrant issued October 4, 2018 in" his state misdemeanor prosecution [Dkt. No. 29] – a motion that the Court denied under the Anti-Injunction Act, *see* Dkt. No. 32 – Plaintiffs failed to respond to the motions to dismiss. And the time to do so has expired.

The undersigned enters these findings of fact, conclusions of law, and recommendation that the Court should grant the motions to dismiss; dismiss with prejudice all claims against the City of Dallas; dismiss with prejudice the claims against Officers Gomez, Hampton-Bradley, Mireles, Padron, Ramsey, Rojas, and Silva based on equal protection, due process, the Texas constitution, and an alleged conspiracy; and re-refer this case to the undersigned for further pretrial management.

## Applicable Background

Plaintiffs' lawsuit is based on an encounter with Dallas police officers, including the individual defendants, that occurred on October 3, 2014:

18. On October 3, 2014, I, Plaintiff Quincy Blakely made

reservations for my family and I at Hattie's restaurant located 418 N Bishop Ave, Dallas, TX 75208 for 7pm.

19. My mother-in-law and niece arrived at Hattie's before 7pm. My mother-in-law parked her car with valet and went into Hattie's to get seated for our reservation.

20. My mother-in-law and niece were advised that the restaurant would not seat incomplete parties and the reservation would be cancelled if arrival is not within 15 minutes of reservation.

21. Because Plaintiff, Kimberly Blakely, our son and I were running late, my mother-in-law contacted us and advised that the reservation would be cancelled, so we could just dine at nearby Gloria's restaurant located at 600 N. Bishop Avenue Dallas, Texas.

22. My mother-in-law and niece left Hattie's restaurant and waited for my wife, son and I to pick them up outside at the corner of Bishop Ave and Seventh Street.

23. Since my mother-in-law had already valeted her vehicle, she just decided to leave it with Hattie's valet in the event there was no handicap parking at Gloria's restaurant.

24. At approximately 7:15pm, we picked up my mother-in-law and niece at the corner of Bishop Ave and Seventh Street and went to Gloria's restaurant located at 600 N. Bishop Avenue Dallas 75208.

25. We arrived at Gloria's restaurant at or about 7:20pm and left at approximately 10:05pm arriving back to pick up my mother-in-law's vehicle.

26. At approximately 10:10pm, myself, my wife, Plaintiff Kimberly Blakely, my 2-year-old son, niece and mother-in-law arrived at the valet stand in front of Hattie's restaurant. I, Quincy Blakely was in the driver's seat, my wife in the passenger and my niece, son and mother in-law in the back seat.

27. My mother-in-law got out, walked up to the valet to retrieve her vehicle. The valet attendant requested $5.00. My mother in law stated she was not advised there was a $5.00 fee, nor was there a posted sign stating there was a valet fee.

28. My mother-in-law stated that when she parked, she asked if there was handicapped parking, and the valet advised that he would park it for her.

29. Plaintiff, Kimberly Blakely got out from the passenger side of the vehicle after listening to valet refuse to get my mother-in-law key, and eventually called 911. While my wife was on the phone with 911, I, Quincy Blakely got out of the vehicle and asked valet where the keys were.

30. The valet attendant looked into the key box and asked what kind of car and what kind of keys. I, Quincy Blakely looked into the

opened key box with the valet and said, while reaching to retrieve the keys, here they are.

31. Plaintiff, Kimberly Blakely asked where the car was parked, and the valet attendant then advised that the car was parked blocks down on ninth street.

32. Plaintiff, Kimberly Blakely then called 911 back to cancel the call and advised that we had the keys and valet provided the location of the vehicle.

33. We all then left the location, attempted to look for the vehicle but were unsuccessful. We went back to the valet stand and were given the exact location of the vehicle; which was parked in the dirt across from 302 W. Ninth Street at Madison. We then retrieved my mother-in-law's vehicle and headed home.

34. During the encounter on October 3, 2014, on or about 10:15pm, defendants Kelly, Gomez Jr. and Rojas, used force upon Plaintiff, Quincy Blakely that was completely unwarranted and unnecessary. In an effort to cover up their use of excessive force, Defendants Kelly and Gomez Jr. caused Plaintiff, Quincy Blakely to be arrested and detained for unlawful carrying firearm and resisting arrest despite a lack of probable cause that Plaintiff, Quincy Blakely committed the offense on which Plaintiff, Quincy Blakely was charged and detained.

35. On or about October 3, 2014, defendant Kelly and defendant Gomez Jr. responded to a call that was initiated by Plaintiff, Kimberly Blakely because valet attendants refused to release keys to a vehicle that was valeted by my mother-in-law.

36. Plaintiff Kimberly Blakely cancelled the 911 call after valet released the keys and advised where the vehicle was parked.

37. While heading home, Plaintiffs were stopped by defendants Kelly and Gomez Jr.

38. Upon stopping Plaintiff's vehicle, I, Quincy Blakely rolled the window down to question why we were being stopped and was advised by defendants Kelly and defendant Gomez Jr. that they were conducting an investigation of a disturbance that took place inside of Hattie's restaurant.

39. Defendants Kelly and Gomez Jr. alleged that they were flagged down by a witness and was advised that Plaintiff's caused a disturbance inside Hattie's restaurant and became agitated toward staff because the staff at Hattie's restaurant could not hold Plaintiff's reservation due to the fact the entire party was not present.

40. I was advised that a witness, now known as Anthony Alvarez, owner of Hattie's restaurant allegedly witnessed the disturbance inside the restaurant by Plaintiff's against his staff.

41. I, Quincy Blakely advised defendants Kelly and Gomez Jr that

myself nor Kimberly Blakely had NEVER been inside of Hattie's restaurant, let alone caused a disturbance with employees about a reservation.

42. I advised defendants Gomez and Kelly that we had just eaten at Gloria's restaurant located 2 blocks away at 600 Bishop Avenue Dallas, Texas, from 7:20pm-10:00pm, showed them my receipt and advised that they have the wrong suspects.

43. Defendant Kelly and defendant Gomez asked for my identification and I, Quincy Blakely provided my Utah concealed handgun license as well. I advised defendants Kelly and Gomez that we had not committed a crime and asked then to identify the witness but the requests were denied.

44. I was advised that I was under arrest. I questioned what I was under arrest for and defendant Kelly and defendant Gomez Jr. refused to answer the question.

45. I advised defendants Gomez Jr. and Kelly that I was armed, after which, with great force, I was pulled from the vehicle, and pushed onto the police vehicle without making any sudden movements, and without protest.

46. I was put into handcuffs and aggressively searched by defendant Kelly. At one point during the search, Defendant Kelly without reason or provocation, grabbed and pulled my testicles after searching my private area more than once.

47. Defendant Gomez Jr. then got the remote to the police vehicle's dash cam and turned down the volume on defendant Kelly, which I can only assume was so they wouldn't be heard verbally abusing me while I was being searched.

48. While being searched excessively and aggressively without provocation, I advised defendant Kelly that the handcuffs were too tight, yet my handcuffs were never loosened, in fact, she tightened the handcuffs even more while Defendant Gomez Jr. looked at the dash cam, moved and positioned himself in front of the view of the dash cam as defendant Kelly tightened the handcuffs.

49. I, Quincy Blakely, advised unknown male defendant to give my weapon and other property to Kimberly Blakely but unknown male defendant declined and stated that my wife refused to accept the property or give her identification, (which is untrue) as defendant simultaneously put my property into a clear bag as my wife shouted to him that she would take the property and had not refused to identify herself.

50. Defendant Hampton-Bradley then asked for plaintiff wife Kimberly Blakely's identification and at that point her Driver's License was provided to Hampton-Bradley.

51. After being placed in the police vehicle with the volume being

-5-

turned down, the heat was turned on and the windows rolled down about a 1/2 inch, as defendants Rojas and Hampton-Bradley began to antagonize and verbally abuse me.

52. I asked over and over for the handcuffs to be loosened and informed them that it was hot in the car, but the request was to no avail.

53. While I was sitting in the back seat, defendant Hampton requested Plaintiff Kimberly Blakely's driver's license. I then saw defendant Hampton jump out of the car and say "she got something out of Grand Prairie."

54. Unknown male Defendant said, "she got a baby in the back, defendant Hampton stated "so what, hook her up" and sat back in her police vehicle.

55. Defendant Kelly then walked over to the vehicle and knocked on the window and said "step out of the vehicle."

56. Kimberly Blakely asked why and Defendant Kelly said you are under arrest. Kimberly Blakely asked why, and defendant Kelly said "for a warrant."

57. Kimberly Blakely requested that defendant Hampton confirm the warrant and asked what the warrant was for and defendant Kelly and Defendant Hampton-Bradley did not confirm.

58. Kimberly Blakely stated that our son was in the back seat and that she was trying to advise my mother-in-law of the situation to come to the scene and get our son and defendant Kelly response was "I don't care, get out."

59. Kimberly Blakely asked unknown male defendant if she could call her mom and explain the situation and advise where we had been stopped so she could come and get the truck, so to bring someone back with her. Unknown male officer agreed.

60. While Kimberly Blakely was talking to my mother-in-law on the phone and advising her of what she needed to do, defendant Gomez Jr. left from the driver's side door of the vehicle where my wife was and is seen on the dash cam video laughing in enjoyment as he was amused by the situation him and his fellow defendants had caused.

61. Unknown male Defendant motioned for Kelly to go to the passenger side of the door to harass and antagonize my 2-year-old son.

62. Defendant Kelly said "open the door" as she pulled and tugged on the back passenger door where my son was seated in his car seat.

63. Defendant Kelly began grabbing my son and searching under his car seat and my wife had to advise her to get her hands off our son and to get out of our vehicle. My son had done nothing for her to open my his door and mentally abuse him the way she did. My son was already scared and defendant Kelly furthered that by aggressively entering my vehicle without cause or permission.

64. Because my wife warned defendant Kelly about being near my son, she came back around to the driver's side of the vehicle, stood in front of my wife and started verbally antagonizing her.

65. After an unknown witness walked up and informed Hampton-Bradley that Plaintiff Quincy Blakely was not the suspect, Hampton-Bradley motioned for Gomez Jr. to come over to her police vehicle, and after they had a conversation, Gomez came over to the vehicle I was seated in.

66. Defendant Gomez Jr. then opened the rear passenger door and reached into the vehicle, put his forearm in my neck while in handcuffs behind my back, and cut off my air supply. I raised my body up by pushing up on my feet hitting my head in the rear car window to try to get Gomez Jr forearm out of my throat.

67. It wasn't until I tried to defend myself, did defendant Gomez Jr. release his forearm from my neck and asked me if I tried to bite him. I relied, "If I wanted to bite you, I would have bitten you, and your arm shouldn't have been in my neck." All of this audio was mysteriously removed, or there was distorting noise added to overlap the original sounds.

68. I have a physical disability that has left me with a deformity and screws in my skull from a traumatic brain aneurysm. I begged and pleaded with the defendants and advised them of my medical condition, but only to get the result of constant antagonism and verbal abuse.

69. Because of my self-defense to preservation of life, a cage vehicle was called over after a hour and a ½ of me sitting in the police vehicle.

70. Defendant Steve Gomez told defendants that I tried to bite him, which was provoked after he put his forearm in my throat while my arms were behind my back, as he cut off my circulation. But I did not bite him.

71. While Gomez Jr. was verbally and physically assaulting me, as I sat handcuffed in the back seat, Defendant Kelly and Defendant Hampton-Bradley ran over to the police vehicle and watched as defendant Gomez Jr. put his forearm in my throat cutting off my circulation.

72. While my wife was still on the phone with my mother-in-law after defendant Gomez Jr. left from physically assaulting me, an unknown male defendant went and snatched Kimberly Blakely's phone away from her.

73. I personally witnessed unknown male Defendant and Defendant Gomez pull my wife from the vehicle with excessive force as defendant Kelly ran over and, hyperextended Kimberly Blakely's arm behind her back while my wife screamed that they were hurting her and to please stop twisting her arm.

74. Defendant Kelly grabbed my wife's left arm and with excessive force twisted it behind her back while my wife screamed "your hurting

me, please stop twisting my arm."

75. Defendant Gomez Jr. then left from the driver's side door after assaulting my wife and went and stood in front of the police dash cam to block the view of the excessive force being committed by defendant Kelly and unknown defendant.

76. These defendants committed this abusive assault on my wife in front of my 2yo son sitting in in his car seat as defendant Kelly stated, "she didn't care."

77. Defendant Kelly then searched my wife after my wife repeatedly asked defendant Kelly to stop sexually assaulting her. My wife, Kimberly Blakely advised Kelly that she had already checked her breast 3 times. Defendant Kelly ignored the request and excessively searched my wife's private areas in public as my wife begged and pleaded for her to remove her hands from her private area because she was on her cycle, her touching was offensive, and unknown defendant stated that defendant Kelly can search her as long as she has put gloves on.

78. Defendant Kelly left my wife with her brassier up above her breast in her strapless sun dress. My wife asked defendant Kelly to fix her clothes because her breast were exposed to the public, but defendant Kelly refused.

79. Kimberly Blakely cried, begged, and pleaded that the defendant stop searching between her legs, but the unknown defendant demanded that she open her legs to the excessive demeaning search that ultimately revealed nothing.

80. The indecent exposure/body cavity search was performed on the public street for the many to view in this tourist district.

81. Unknown defendant was advised by defendant Kelly to search Kimberly Blakely's purse and our vehicle, although our vehicle was not being towed, there was no search warrant and there was nothing in our vehicle that would further the investigation of an alleged disturbance inside a restaurant.

82. Unknown defendant searched the vehicle and left the driver's door and passenger door open as people walked by while our 2-year old son was in the vehicle by himself, putting him in harm's way of anyone jumping into the vehicle and driving off or simply taking our son.

83. Kimberly Blakely asked defendant Kelly what she was being arrested for and where she was going, and Kelly replied, "don't worry about it!"

84. While I, Quincy Blakely was being verbally abused by Hampton-Bradley and continuously asking defendants Hampton Bradley, Rojas, Gomez Jr. and Hinojosa to loosen the handcuffs, I tried to adjust myself to keep from passing out and needed to relieve the pressure from my wrists as they had swollen up from the excessive pressure and the

heat. I then became verbally agitated because of their refusal to loosen the cuffs and provide me with cool air.

85. I then unbuckled the seat belt as it was digging in my neck and literally cutting off my oxygen. I felt as if I was going to die.

86. During the change to the caged car, Defendant Rojas decided to search me again after sitting in the police vehicle for over an hour and 1/2. Defendant Rojas aggressively and without cause grabbed my testicles and squeezed them tightly as he verbally assaulted me.

87. During the change to the caged vehicle, the defendants Kelly, Hinojosa and Rojas used excessive force by placing my handcuffed arms that were behind my back above my head and shoving me against the police vehicle causing more injury to my wrist, arms, shoulder and chest.

88. Defendant Kelly then came over after talking to defendant Gomez Jr. and questioned what happened. Kelly then shoved me into the caged vehicle hitting my head on the top of the caged vehicles door jam.

89. After gaining control of my body from the excessive force while in handcuffs, I sat in the vehicle, lifted my feet up and turned my body forward where I sat in the caged vehicle, as the defendants maliciously pulled the car right to the front of the restaurant for all who passed by to view. I sat there for an additional 2 hours.

90. I did not arrive to the detention center until 2:30 am, which was more than 3 ½ hours after initial detainment. While continuing to be subjected to their cruel, and unusual punishment.

91. As a result of the 3 ½ hour investigation of a disturbance in Hattie's restaurant alleged to be committed by my wife and I, I was charged with resisting arrest and unlawful carrying of a weapon. I was fined for assault and theft of service, although witnesses advised that I did not commit any crime and this can be confirmed by the dash cam video which I will tender to this court.

92. Defendant Hampton-Bradley stated to defendant Kelly, just "charge him with everything" after hearing the witness state that it was not me that committed any crime.

93. Plaintiff Kimberly Blakely was not charged with any offense. She was placed in the Dallas City Detention Center for no driver's license. Even thought the defendants were in possession of her DL.

94. Plaintiffs have the certified copy of police video dash cam obtained from the Dallas Police Department of defendant Kelly advising defendant Hampton-Bradley that the witness has said that Plaintiffs were not the individuals that committed the offenses. Defendant Hampton stated to just charge Plaintiff Quincy Blakely anyway and to take Kimberly Blakely wherever.

95. There was nothing named in the complaint that described any force used against said Defendant, Kelly. The complaint simply states

that: "Quincy Blakely did then and there intentionally prevent and obstruct J. Kelly......from effecting the arrest or search or transportation of the defendant, by using force against said peace officer." I, Quincy Blakely deny.

96. I, Quincy Blakely deny that I used force against Defendant Kelly, and the false charges against me were done in an effort to justify the use of excessive force and constitutional violations against me, Quincy Blakely and Kimberly Blakely.

97. The arrest for the charge of unlawful carrying a firearm M1461834, was dropped, never filed. The resisting arrest charge M1461834 was dismissed August 21, 2017.

Dkt. No. 15 at 6-20.

## Legal Standards

In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief may be granted, the Court "accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205-06 (5th Cir. 2007). But a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and must plead those facts with enough specificity "to raise a right to relief above the speculative level," *id.* at 555.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "A claim for relief is implausible on its face when 'the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.'" *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d

787, 796 (5th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 679).

While, under Federal Rule of Civil Procedure 8(a)(2), a complaint need not contain detailed factual allegations, a plaintiff must allege more than labels and conclusions, and, while a court must accept all of a plaintiff's allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). A threadbare or formulaic recitation of the elements of a cause of action, supported by mere conclusory statements, will not suffice. *See id*. But, "to survive a motion to dismiss" under *Twombly* and *Iqbal*, a plaintiff need only "plead facts sufficient to show" that the claims asserted have "substantive plausibility" by stating "simply, concisely, and directly events" that Plaintiff contends entitle him or her to relief. *Johnson v. City of Shelby, Miss.*, 574 U.S. ___, 135 S. Ct. 346, 347 (2014) (per curiam) (citing FED. R. CIV. P. 8(a)(2)-(3), (d)(1), (e)).

The United States Supreme Court "has made clear that a Rule 12(b)(6) motion turns on the sufficiency of the '*factual* allegations' in the complaint," *Smith v. Bank of Am., N.A.*, 615 F. App'x 830, 833 (5th Cir. 2015) (per curiam) (quoting *Johnson*, 135 S. Ct. at 347; emphasis added by *Smith*), and the Federal Rules of Civil Procedure "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted," *Johnson*, 135 S. Ct. at 346. That rationale has even more force in this case, as the Court "must construe the pleadings of *pro se* litigants liberally." *Andrade*, 459 F.3d at 543; *but see Smith v. CVS Caremark Corp.*, No. 3:12-cv-2465-B, 2013 WL 2291886, at *8 (N.D. Tex. May 23, 2013) ("[L]iberal construction

-11-

does not require that the Court or a defendant create causes of action where there are none.").

A court cannot look beyond the pleadings in deciding a Rule 12(b)(6) motion. *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). Pleadings in the Rule 12(b)(6) context include attachments to the complaint. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). Documents "attache[d] to a motion to dismiss are considered to be part of the pleadings, if they are referred to in the plaintiff's complaint and are central to her claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000) (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)).

While the United States Court of Appeals for "the Fifth Circuit has not articulated a test for determining when a document is central to a plaintiff's claims, the case law suggests that documents are central when they are necessary to establish an element of one of the plaintiff's claims. Thus, when a plaintiff's claim is based on the terms of a contract, the documents constituting the contract are central to the plaintiff's claim." *Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 662 (N.D. Tex. 2011). "However, if a document referenced in the plaintiff's complaint is merely evidence of an element of the plaintiff's claim, then the court may not incorporate it into the complaint." *Id.* In addition, "it is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record." *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007); *accord Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2008).

"Ordinarily, 'a *pro se* litigant should be offered an opportunity to amend [her] complaint before it is dismissed.' ... Granting leave to amend, however, is not required if the plaintiff has already pleaded her 'best case.' A plaintiff has pleaded her best case after she is apprised of the insufficiency of her complaint. [And a] plaintiff may indicate she has not pleaded her best case by stating material facts that she would include in an amended complaint to overcome the deficiencies identified by the court." *Wiggins v. La. State Univ. – Health Care Servs. Div.*, 710 F. App'x 625, 627 (5th Cir. 2017) (per curiam) (quoting *Brewster v. Dretke*, 587 F.3d 764, 767-68 (5th Cir. 2009); citations and internal quotation marks omitted).

### Analysis

The Court should grant the pending motions to dismiss and therefore dismiss all claims against the City and certain claims against the individual defendants. And, while this litigation will continue, the Court should further find that it has moved beyond the pleadings stage. Plaintiffs have had ample time to state their best case, have done so by filing an amended complaint after the Court granted their motion to reopen the case, and have failed to respond to the pending motions to dismiss – all of which indicate to the Court that Plaintiffs have stated their best case.

I.    <u>City of Dallas</u>

"A municipality" – like the City of Dallas – "and/or its policymakers may be held liable under § 1983 'when execution of a government's policy or custom ... by those whose edicts or acts may fairly be said to represent official policy, inflicts the [constitutional] injury.'" *Salazar-Limon v. City of Houston*, 826 F.3d 272, 277 (5th Cir.

2016) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); citation omitted). That is, "[t]here is no vicarious municipal liability under § 1983; rather, plaintiffs 'must prove that "action pursuant to official municipal policy" caused their injury.'" *Three Legged Monkey, L.P. v. City of El Paso, Tex.*, 652 F. App'x 236, 239 (5th Cir. 2016) (quoting *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting, in turn, *Monell*, 436 U.S. at 691)).

To assert liability under *Monell*, Plaintiffs must allege "(1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009) (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)); *see also id.* ("A municipality is almost never liable for an isolated unconstitutional act on the part of an employee; it is liable only for acts directly attributable to it 'through some official action or imprimatur.'" (quoting *Piotrowski*, 237 F.3d at 578)); *Peña v. City of Rio Grande City*, 879 F.3d 613, 624 (5th Cir. 2018) ("Though it is true that a plaintiff may establish deliberate indifference [to, in turn, establish municipal liability] through a single incident," ... caselaw in this circuit "suggests ... that [this] exception is generally reserved for those cases in which the government actor was provided no training whatsoever." (quoting *Burge v. St. Tammany Parish*, 336 F.3d 363, 372 (5th Cir. 2003); citations and internal quotation marks omitted)).

In their amended complaint, Plaintiffs assert that, "[a]t the time of the events [alleged], [1] the individual Defendants were acting under color of the law and regulations of the State of Texas and the Dallas Police Department and in the course

and scope of their employment for the City" and "[2] the Dallas City Council was the City's final policymaker regarding the conduct of its police officers and had actual or constructive knowledge of the inadequate supervision and training that, in reasonable probability, cause the incident that forms the basis of this lawsuit." Dkt. No. 15, ¶¶ 130, 131. They further allege that, "[a]s a result of the inadequate training and supervision, the charge of unlawfully carrying a firearm was dropped and never filed, but as a result, the property was never returned after numerous requests for the return of the property." *Id.*, ¶ 149; *see also id.*, ¶ 150 ("The need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the City can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.").

Thus, Plaintiffs attempt to establish municipal liability on a "failure to train" theory. And, while, "[i]n limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983," *Hicks-Fields v. Harris Cnty., Tex.*, 860 F.3d 803, 811 (5th Cir. 2017) (quoting *Connick*, 563 U.S. at 61), "[e]ven within the difficult world of *Monell* liability, failure-to-train claims are especially difficult to establish," *Anderson v. Marshall Cnty., Miss.*, 637 F. App'x 127, 134 (5th Cir. 2016) (per curiam) (citing *Connick*, 563 U.S. at 61 ("A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a

failure to train.")).

"The Supreme Court established the 'failure to train' method of proving municipal liability in *City of Canton v. Harris*, 489 U.S. 378, 386-92 (1989)." *Littrell v. Houston Indep. Sch. Dist.*, 894 F.3d 616, 624 (5th Cir. 2018).

> Under *Canton*, when a municipal entity enacts a facially valid policy but fails to train its employees to implement it in a constitutional manner, that failure constitutes "official policy" that can support municipal liability if it "amounts to deliberate indifference." To prove deliberate indifference at trial, Plaintiffs must show that, "in light of the duties assigned to specific officers or employees[,] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers ... can reasonably be said to have been deliberately indifferent to the need."

*Id.* (quoting *Canton*, 489 U.S. at 388, 390).

Plaintiffs, at best, assert that "[t]he need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights," that the policymakers of the City can reasonably be said to have been deliberately indifferent." Dkt. No. 15, ¶ 150. But the Court need not "accept as true [this] legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555; *see also Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010) (a court need "not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions" (quoting *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005); citation omitted)). And an examination of the amended complaint for allegations specific to how the City could be liable reveals that Plaintiffs fail to provide even "minimal factual allegations" that ultimately could support a showing of deliberate indifference. *E.G. by Gonzalez v. Bond*, No. 1:16-cv-68-BL, 2017 WL 3493124, at *6

(N.D. Tex. June 29, 2017) ("Despite the various arguments made by the City, the Court should find that Plaintiffs have made factual allegations in their second amended complaint to state plausible claims based upon failures to train, supervise, and discipline. Plaintiffs have identified training, supervision, and discipline procedures that are inadequate. They have also alleged that the City was deliberately indifferent in adopting the identified policies and that the inadequate policies directly caused their injuries. They have alleged sufficient facts to support these allegations and do not merely rely on conclusions and labels. When considering a motion to dismiss, minimal factual allegations are sufficient to assert a municipal liability claim." (citing *Harvey v. Montgomery Cnty.*, 881 F. Supp. 2d 785, 797 (S.D. Tex. 2012))), *rec. adopted*, 2017 WL 3491853 (N.D. Tex. Aug. 14, 2017).

Plaintiffs further fail to directly allege that their rights were violated under an official policy of the City of Dallas.

The City's motion to dismiss should therefore be granted.

## II.    Individual Defendants

Based on the alleged facts set out above, Plaintiffs appear to assert these causes of action against the individual defendants:

- Excessive Force, in violation of the Fourth Amendment to the United States Constitution, in violation of the Due Process and Equal Protection Clauses of the United States Constitution, and in violation of corresponding protections afforded by the Texas Constitution;

- False Arrest, in violation of the United States and Texas Constitutions;

-17-

- • Child Endangerment;

- • Injury to Disabled Individual;

- • Bystander Liability;

- • Conspiracy to deprive them of their constitutionally-protected rights; and

- • Deprivation of private property.

Officers Gomez, Hampton-Bradley, Mireles, Padron, Ramsey, Rojas, and Silva do not move to dismiss all of these claims. They instead move to dismiss (1) claims based on the Equal Protection Clause; (2) Fourth Amendment claims based on the Due Process Clause; (3) claims based on the Texas Constitution; (4) claims made under the Fifth Amendment to the United States Constitution; and (5) Plaintiffs' conspiracy claim. The undersigned will address each in turn.

## A.    Equal Protection and Due Process

Plaintiffs appear to allege that, in addition to the Fourth Amendment to the United States Constitution, both that constitution's equal protection and due process provisions support their excessive force claim.

The Equal Protection Clause prohibits a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. This provision "is essentially a direction that all persons similarly situated should be treated alike." *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 212 (5th Cir. 2009) (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985)); *see also Williams v. Bramer*, 180 F.3d 699, 705 (5th Cir. 1999) ("The Equal Protection Clause directs that persons similarly situated should be treated alike." (citing *Plyler v. Doe*,

457 U.S. 202, 216 (1982))).

To state an equal protection claim, a plaintiff typically alleges that he "received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent." *Club Reno*, 568 F.3d at 212 (internal quotation marks omitted). But Plaintiffs fail to allege that they were treated differently from others similarly situated – much less that such treatment was because of discrimination.

And no equal protection violation may be alleged where a plaintiff "fails to allege any facts showing that [others were] similarly situated." *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 414 (5th Cir. 2015) (citing *Club Retro*, 568 F.3d at 213); *see also Gibson v. Tex. Dep't of Ins. – Div. of Worker's Comp.*, 700 F.3d 227, 238 (5th Cir. 2012) (a viable claim under the Equal Protection Clause must include an allegation that plaintiff "has been 'intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment'" (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000))); *Woodard v. Andrus*, 419 F.3d 348, 354 (5th Cir. 2005) ("Woodard has made no showing that Andrus is selectively enforcing the state statute based upon any impermissible ground. She does not assert that Andrus is distinguishing between different groups. Therefore, Woodard has not stated an equal protection claim." (citing *Rolf v. City of San Antonio*, 77 F.3d 823, 828 (5th Cir. 1996))).

The Court should therefore dismiss any claims based on the Equal Protection Clause.

To the extent that Plaintiffs attempts to allege a separate due process violation based on the Fourth Amendment, they include no factual allegations unique to a due process violation. *See, e.g.,* Dkt. No. 15, ¶ 99 ("The use of excessive force by Defendants Gomez, Kelly and Rojas was unreasonable under the Fourth Amendment of the United States Constitution. Those actions violated Plaintiffs' rights to due process, to equal protection, and give rise to Plaintiffs' claims pursuant to the Fourth Amendment to the Constitution of the United States and 42. U.S.C. § 1983, and their counterparts in the Texas Constitution."). And to the extent that they assert a Fourth Amendment violation under the Fourteenth Amendment's more general due process protections, a separate substantive due process claim cannot be alleged. *See, e.g.*, *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997) ("*Graham* simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989))). Similarly, the Court's consideration of Plaintiffs' excessive force allegations under Fourteenth Amendment procedural due process will be incorporated into its consideration of those allegations under the Fourth Amendment itself. *See, e.g., Lowe v. Dallas Police Dep't*, No. 3:17-704-G-BN, 2017 WL 4863076, at *5 (N.D. Tex. Oct. 17, 2017) ("[W]hile *Graham* may not mean that a claim that Lowe's right to procedural due process is subsumed by the Fourth Amendment, practically speaking, it cannot be that the analysis differs as between a Fourth Amendment violation and a procedural due process violation based on the same

seizure."), *rec. adopted*, 2017 WL 4838980 (N.D. Tex. Oct. 26, 2017).

Finally, Plaintiffs seem to also allege – against police officers who are not federal agents – a Fifth Amendment due process violation. *See* Dkt. No. 15, ¶ 141 ("My rights guaranteed by the Fifth Amendment of the U.S.C were deprived without due process of law. My rights guaranteed by the Fifth Amendment of the U.S.C have been deprived as my private property, concealed handgun license, and handgun have been taken for public use, without just compensation."). This claim should also be dismissed, as "[t]he Fifth Amendment's due process clause and the protections it affords apply only to violations by the United States or a federal actor." *Good v. City of Irving, Tex.*, No. 3:06-cv-2133-K, 2009 WL 804701, at *5 (N.D. Tex. Mar. 26, 2009) (citing *Jones v. City of Jackson*, 203 F.3d 875, 880 (5th Cir. 2000) (citing, in turn, *Morin v. Caire*, 77 F.3d 116, 120 (5th Cir. 1996)); citations omitted).

The Court should therefore dismiss due process claims not tethered to an alleged Fourth Amendment violation.

## B.  **Texas Constitution**

In addition to alleging their excessive force and false arrest claims under Section 1983, Plaintiffs seek to bring these claims under the Texas Constitution. *See* Dkt. No. 15, ¶¶ 99 & 106. But, as another judge of the Court has concluded in a similar context, "there is no legal basis for Plaintiffs' claims for violations of the Texas Constitution." *Cortes v. Havens*, No. 3:14-cv-1044-B, 2014 WL 6861245, at *6 (N.D. Tex. Dec. 5, 2014).

In *Cortes*, the plaintiffs alleged

that Defendants violated their rights under Article I, Section 9 of the

Texas Constitution, which provides that "[t]he people shall be secure in their persons, houses, papers and possessions, from all unreasonable seizures or searches, and no warrant to search any place, or to seize any person or thing, shall issue without describing them as near as may be, nor without probable cause, supported by oath or affirmation."

*Id.* at *5 (quoting TEX. CONST. art. I, § 9). And the Court found

that Plaintiffs cannot assert a private cause of action for alleged violations of the Texas Constitution. Defendants direct the Court to *City of Beaumont v. Bouillion*, in which the Texas Supreme Court held that there is no implied private right of action under the free speech and free assembly sections of the Texas Constitution. 896 S.W.2d 143, 147-50 (Tex. 1995). The Texas Supreme Court concluded that, upon "review of the language of the Constitution," there "is no basis from the text of the Constitution to assume a party is given more than equitable protection." *Id.* at 149. The ruling of *Bouillion* "has since been expanded to recognize there is 'no private cause of action against a governmental entity or its officials for money damages relating to alleged violations of Texas constitutional rights.'" *McHenry v. Stinnett Police Dep't*, No. 2:13-CV-0228-J, 2014 WL 4771768, *10 (N.D. Tex. Aug. 8, 2014) (quoting *Hamilton v. Pechacek*, 319 S.W.3d 801, 812-13 (Tex. App. – Fort Worth 2010, no pet.)) (dismissing plaintiff's claim for damages pursuant to Article I, Section 9 of the Texas Constitution for alleged violations of the right to be free from unreasonable searches and seizures).

In response, Plaintiffs direct the Court to *Weyer v. Wegner* for the proposition that a person whose right to be free from unreasonable search and seizure has been violated can bring a civil action for damages against the officer who committed the act. 58 Tex. 539 (1883). As Defendants note, Plaintiffs' reliance on this case is misplaced. The claim in *Weyer* did not arise under the Texas Constitution, but was rather a claim for trespass on real property; nowhere does the *Weyer* court discuss a private cause of action under the Texas Constitution. *Id.* at 542.

The distinction between a private cause of action created by the Texas Constitution and an independent tort claim is further discussed by the Texas Supreme Court in *Bouillion*. 896 S.W.2d 143. Examining the history of Texas common law and finding that it has not provided a cause of action for violations of constitutional rights, the Texas Supreme Court stated:

The only Texas case we can find that can be read to allow an award of damages for violation of constitutionally protected rights is *Gold v. Campbell*, 54 Tex. Civ. App. 269, 117 S.W. 463 (Tex. Civ. App. – El Paso 1909, no writ). There, the

> court of appeals recognized that a victim of false
> imprisonment could pursue a tort cause of action against an
> officer. However, the cause of action alleged in *Gold* was the
> traditional common law tort of false imprisonment, not a
> tort for the violation of constitutional rights. *Gold* did not
> create a new cause of action; rather, it recognized that an
> officer who acts outside the scope of his authority is
> amenable to suit under a traditional common law cause of
> action. We disapprove of any interpretation of *Gold* that
> concludes it authorized a constitutional tort cause of action.

896 S.W.2d at 150.

*Id.* at *5-*6 (citation omitted); *see also Aston v. City of Cleburne*, No. 3:99-cv-2255-H,

2000 WL 217876, at *3 (N.D. Tex. Feb. 22, 2000) ("The complaint further alleges that

all Defendants, including the City of Cleburne, violated 'the statutes, laws, and

Constitution of the State of Texas' through malicious prosecution, false arrest and/or

false imprisonment. Texas law provides no private cause of action for a violation of a

right guaranteed by the Texas Constitution. Therefore, Plaintiffs' claims under the

Texas Constitution are dismissed." (citing *Bouillion*, 896 S.W.2d at 149; *Gillum v. City

of Kerrville*, 3 F.3d 117 (5th Cir. 1993))).

For these reasons, the Court should dismiss Plaintiffs' claims asserted under the

Texas Constitution.

## C.    Conspiracy

Plaintiffs' conspiracy allegations are that

Defendants Hinojosa, Hampton-Bradley, Kelly, Rojas, Gomez and Mireles
entered into conspiracy to deprive Plaintiffs of their right to be free from
illegal seizure and detention by acting in concert either to orchestrate or
carry out the illegal seizure, illegal detention, and false statements in
their sworn testimony described in this Complaint when they knew there
was no probable cause to arrest or charge a criminal offense on which
Plaintiffs were illegally incarcerated and detained. Vested with

knowledge that they had lied about the factual basis for the arrest, no reasonable officer in these Defendant's positions would have believed that the circumstances provided probable cause to cause Plaintiff to be charged with the offense of resisting arrest, unlawful carrying firearm and fined for assault and theft of service, yet these Defendants conspired to so charge the Plaintiff, Quincy Blakely and arrest Plaintiff Kimberly Blakely on an unconfirmed warrant and without cause. These defendants are liable to the Plaintiffs for their violations of the Fourth Amendment under 42 U.S.C. 1983.

The conspiracy involved state action, as the defendants acted under the color of statue, customs, ordinances, and usage of the State of Texas and the City of Dallas.

Dkt. No. 15, ¶¶ 135 & 136.

While Plaintiffs may allege that the individual defendants deprived them of constitutionally-protected rights, Plaintiff fail "to allege any facts in support of [their] claim that [these defendants] conspired against [them]" to do so. *McAfee v. 5th Circuit Judges*, 884 F.2d 221, 222 (5th Cir. 1989). Such "mere conclusory allegations of conspiracy cannot, absent reference to material facts, state a substantial claim of federal conspiracy." *Powell v. Martinez*, 579 F. App'x 250, 252 (5th Cir. 2014) (per curiam) (quoting *McAfee*, 884 F.2d at 222); *see also Brinkmann v. Johnston*, 793 F.2d 111, 113 (5th Cir. 1986) (per curiam) ("In § 1983 cases, our Court requires that the 'claimant ... state specific facts, not merely conclusory allegations.'" And we have "held that 'mere conclusory allegations of conspiracy cannot, absent reference to material facts,' state a substantial claim of federal conspiracy under 42 U.S.C. § 1983." (citations omitted)); *Avdeef v. Royal Bank of Scotland, P.L.C.*, 616 F. App'x 665, 675 (5th Cir. 2015) (per curiam) (To allege a plausible conspiracy claim, a plaintiff may not merely "rest[ ] on his conclusory charges that a conspiracy existed."); *cf. Aguocha-Ohakweh v.*

*Harris Cnty. Hosp. Dist.*, 731 F. App'x 312, 315 (5th Cir. 2018) (per curiam) ("Because the Ohakwehs neither state a plausible claim to relief under § 1983, nor point to any facts plausibly supporting the existence of a conspiracy, the district court properly dismissed their constitutional claims.").

The Court should therefore dismiss Plaintiffs' conspiracy claims.

## Recommendation

The Court should grant the motions to dismiss [Dkt. Nos. 26 & 27] and dismiss with prejudice all claims against the City of Dallas and certain claims asserted against Officers Steve Gomez, Jr., Pamela Hampton-Bradley, Francisco J. Mireles, Fidel Padron, Robert Ramsey, Pablo Rojas, and Fernando Silva – claims based on equal protection, due process, the Texas constitution, and an alleged conspiracy – and re-refer this action to the undersigned United States magistrate judge for further pretrial management.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure

to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: April 15, 2019

_____
DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE