IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| QUINCY DEMOND BLAKELY and KIMBERLY BLAKELY, | § § § | |
| Plaintiffs, | § § | |
| V. | § § | No. 3:16-cv-2801-K-BN |
| JEANETTE L. KELLY, ET AL., | § § | |
| Defendants. | § § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE**

Plaintiffs Quincy Demond Blakely and Kimberly Blakely paid the filing fee to bring this *pro se* civil rights action under 42 U.S.C. § 1983. Their action has been referred to the undersigned United States magistrate judge for pretrial management under 28 U.S.C. § 636(b) and an order of reference from United States District Judge Ed Kinkeade.

Based on Mr. Blakely's then-ongoing state misdemeanor prosecution, the Court stayed and administratively closed this action on November 3, 2016. *See* Dkt. Nos. 11 & 12. On May 20, 2018, the Blakelys moved to reopen their case, attaching to that motion an order dismissing the misdemeanor prosecution against Mr. Blakely. *See* Dkt. No. 13. The Court granted their motion, and, because they paid the filing fee, directed the Blakelys to serve their complaint by August 20, 2018. *See* Dkt. No. 14.

The Blakelys filed an amended complaint [Dkt. No. 15] before that deadline. Several defendants filed waivers of service in September 2018. *See* Dkt. Nos. 17-24.

And, on October 8, 2018, Defendants City of Dallas, *see* Dkt. No. 26, and Officers Steve Gomez, Jr., Pamela Hampton-Bradley, Francisco J. Mireles, Fidel Padron, Robert Ramsey, Pablo Rojas, and Fernando Silva (the "Officer Defendants"), *see* Dkt No. 27, moved to dismiss some – but not all – of the Blakelys' claims against them under Federal Rule of Civil Procedure 12(b)(6).

The Court granted the motion, dismissing all claims against the City and the claims based on equal protection, due process, the Texas constitution, and an alleged conspiracy asserted against the Officer Defendants. *See Blakely v. Kelly*, No. 3:16-cv-2801-K-BN, 2019 WL 2013808 (N.D. Tex. Apr. 15, 2019), *rec. accepted*, 2019 WL 2008543 (N.D. Tex. May 7, 2019).

The Officer Defendants answered as to the remaining claims, *see generally* Dkt. No. 36, asserting in their answer that they are entitled to qualified immunity, *see id.*, ¶ 2.7. They then filed a court-ordered motion for summary judgment on that nominally affirmative defense. *See* Dkt. Nos. 38 & 39; *see also* Dkt. No. 37. The Court next ordered the Blakelys to either file a motion for leave to conduct limited discovery in order to respond to the qualified immunity issues raised in the summary judgment motion or, alternatively, advise the Court that they do not need to conduct discovery to respond to Defendants' summary judgment motion. *See* Dkt. No. 40. They did neither, and the Court entered a briefing order. See Dkt. No. 45. The Blakelys eventually filed a response. *See* Dkt. Nos. 55 & 66. And the Officer Defendant replied. *See* Dkt. No. 67.

Separately, Defendant Jesus Hinojosa, Jr., another Dallas police officer,

appeared and moved to dismiss the Blakelys' claims against him under Federal Rule of Civil Procedure 12(b)(6). *See* Dkt. No. 41. The Blakelys responded. *See* Dkt. No. 54. And Hinojosa filed a reply. *See* Dkt. No. 63.

The undersigned enters these findings of fact, conclusions of law, and recommendation that the Court should grant both the motion for summary judgment and the motion to dismiss and therefore dismiss this action with prejudice.

## Applicable Background

Plaintiffs' lawsuit is based on an encounter with Dallas police officers that occurred on October 3, 2014:

> 18. On October 3, 2014, I, Plaintiff Quincy Blakely made reservations for my family and I at Hattie's restaurant located 418 N Bishop Ave, Dallas, TX 75208 for 7pm.
> 19. My mother-in-law and niece arrived at Hattie's before 7pm. My mother-in-law parked her car with valet and went into Hattie's to get seated for our reservation.
> 20. My mother-in-law and niece were advised that the restaurant would not seat incomplete parties and the reservation would be cancelled if arrival is not within 15 minutes of reservation.
> 21. Because Plaintiff, Kimberly Blakely, our son and I were running late, my mother-in- law contacted us and advised that the reservation would be cancelled, so we could just dine at nearby Gloria's restaurant located at 600 N. Bishop Avenue Dallas, Texas.
> 22. My mother-in-law and niece left Hattie's restaurant and waited for my wife, son and I to pick them up outside at the corner of Bishop Ave and Seventh Street.
> 23. Since my mother-in-law had already valeted her vehicle, she just decided to leave it with Hattie's valet in the event there was no handicap parking at Gloria's restaurant.
> 24. At approximately 7:15pm, we picked up my mother-in-law and niece at the corner of Bishop Ave and Seventh Street and went to Gloria's restaurant located at 600 N. Bishop Avenue Dallas 75208.
> 25. We arrived at Gloria's restaurant at or about 7:20pm and left at approximately 10:05pm arriving back to pick up my mother-in-law's vehicle.

26. At approximately 10:10pm, myself, my wife, Plaintiff Kimberly Blakely, my 2-year-old son, niece and mother-in-law arrived at the valet stand in front of Hattie's restaurant. I, Quincy Blakely was in the driver's seat, my wife in the passenger and my niece, son and mother in-law in the back seat.

27. My mother-in-law got out, walked up to the valet to retrieve her vehicle. The valet attendant requested $5.00. My mother in law stated she was not advised there was a $5.00 fee, nor was there a posted sign stating there was a valet fee.

28. My mother-in-law stated that when she parked, she asked if there was handicapped parking, and the valet advised that he would park it for her.

29. Plaintiff, Kimberly Blakely got out from the passenger side of the vehicle after listening to valet refuse to get my mother-in-law key, and eventually called 911. While my wife was on the phone with 911, I, Quincy Blakely got out of the vehicle and asked valet where the keys were.

30. The valet attendant looked into the key box and asked what kind of car and what kind of keys. I, Quincy Blakely looked into the opened key box with the valet and said, while reaching to retrieve the keys, here they are.

31. Plaintiff, Kimberly Blakely asked where the car was parked, and the valet attendant then advised that the car was parked blocks down on ninth street.

32. Plaintiff, Kimberly Blakely then called 911 back to cancel the call and advised that we had the keys and valet provided the location of the vehicle.

33. We all then left the location, attempted to look for the vehicle but were unsuccessful. We went back to the valet stand and were given the exact location of the vehicle; which was parked in the dirt across from 302 W. Ninth Street at Madison. We then retrieved my mother-in-law's vehicle and headed home.

34. During the encounter on October 3, 2014, on or about 10:15pm, defendants Kelly, Gomez Jr. and Rojas, used force upon Plaintiff, Quincy Blakely that was completely unwarranted and unnecessary. In an effort to cover up their use of excessive force, Defendants Kelly and Gomez Jr. caused Plaintiff, Quincy Blakely to be arrested and detained for unlawful carrying firearm and resisting arrest despite a lack of probable cause that Plaintiff, Quincy Blakely committed the offense on which Plaintiff, Quincy Blakely was charged and detained.

35. On or about October 3, 2014, defendant Kelly and defendant Gomez Jr. responded to a call that was initiated by Plaintiff, Kimberly Blakely because valet attendants refused to release keys to a vehicle that

was valeted by my mother-in-law.

36. Plaintiff Kimberly Blakely cancelled the 911 call after valet released the keys and advised where the vehicle was parked.

37. While heading home, Plaintiffs were stopped by defendants Kelly and Gomez Jr.

38. Upon stopping Plaintiff's vehicle, I, Quincy Blakely rolled the window down to question why we were being stopped and was advised by defendants Kelly and defendant Gomez Jr. that they were conducting an investigation of a disturbance that took place inside of Hattie's restaurant.

39. Defendants Kelly and Gomez Jr. alleged that they were flagged down by a witness and was advised that Plaintiff's caused a disturbance inside Hattie's restaurant and became agitated toward staff because the staff at Hattie's restaurant could not hold Plaintiff's reservation due to the fact the entire party was not present.

40. I was advised that a witness, now known as Anthony Alvarez, owner of Hattie's restaurant allegedly witnessed the disturbance inside the restaurant by Plaintiff's against his staff.

41. I, Quincy Blakely advised defendants Kelly and Gomez Jr that myself nor Kimberly Blakely had NEVER been inside of Hattie's restaurant, let alone caused a disturbance with employees about a reservation.

42. I advised defendants Gomez and Kelly that we had just eaten at Gloria's restaurant located 2 blocks away at 600 Bishop Avenue Dallas, Texas, from 7:20pm-10:00pm, showed them my receipt and advised that they have the wrong suspects.

43. Defendant Kelly and defendant Gomez asked for my identification and I, Quincy Blakely provided my Utah concealed handgun license as well. I advised defendants Kelly and Gomez that we had not committed a crime and asked then to identify the witness but the requests were denied.

44. I was advised that I was under arrest. I questioned what I was under arrest for and defendant Kelly and defendant Gomez Jr. refused to answer the question.

45. I advised defendants Gomez Jr. and Kelly that I was armed, after which, with great force, I was pulled from the vehicle, and pushed onto the police vehicle without making any sudden movements, and without protest.

46. I was put into handcuffs and aggressively searched by defendant Kelly. At one point during the search, Defendant Kelly without reason or provocation, grabbed and pulled my testicles after searching my private area more than once.

47. Defendant Gomez Jr. then got the remote to the police vehicle's

dash cam and turned down the volume on defendant Kelly, which I can only assume was so they wouldn't be heard verbally abusing me while I was being searched.

48. While being searched excessively and aggressively without provocation, I advised defendant Kelly that the handcuffs were too tight, yet my handcuffs were never loosened, in fact, she tightened the handcuffs even more while Defendant Gomez Jr. looked at the dash cam, moved and positioned himself in front of the view of the dash cam as defendant Kelly tightened the handcuffs.

49. I, Quincy Blakely, advised unknown male defendant to give my weapon and other property to Kimberly Blakely but unknown male defendant declined and stated that my wife refused to accept the property or give her identification, (which is untrue) as defendant simultaneously put my property into a clear bag as my wife shouted to him that she would take the property and had not refused to identify herself.

50. Defendant Hampton-Bradley then asked for plaintiff wife Kimberly Blakely's identification and at that point her Driver's License was provided to Hampton-Bradley.

51. After being placed in the police vehicle with the volume being turned down, the heat was turned on and the windows rolled down about a 1/2 inch, as defendants Rojas and Hampton-Bradley began to antagonize and verbally abuse me.

52. I asked over and over for the handcuffs to be loosened and informed them that it was hot in the car, but the request was to no avail.

53. While I was sitting in the back seat, defendant Hampton requested Plaintiff Kimberly Blakely's driver's license. I then saw defendant Hampton jump out of the car and say "she got something out of Grand Prairie."

54. Unknown male Defendant said, "she got a baby in the back, defendant Hampton stated "so what, hook her up" and sat back in her police vehicle.

55. Defendant Kelly then walked over to the vehicle and knocked on the window and said "step out of the vehicle."

56. Kimberly Blakely asked why and Defendant Kelly said you are under arrest. Kimberly Blakely asked why, and defendant Kelly said "for a warrant."

57. Kimberly Blakely requested that defendant Hampton confirm the warrant and asked what the warrant was for and defendant Kelly and Defendant Hampton-Bradley did not confirm.

58. Kimberly Blakely stated that our son was in the back seat and that she was trying to advise my mother-in-law of the situation to come to the scene and get our son and defendant Kelly response was "I don't care, get out."

-6-

59. Kimberly Blakely asked unknown male defendant if she could call her mom and explain the situation and advise where we had been stopped so she could come and get the truck, so to bring someone back with her. Unknown male officer agreed.

60. While Kimberly Blakely was talking to my mother-in-law on the phone and advising her of what she needed to do, defendant Gomez Jr. left from the driver's side door of the vehicle where my wife was and is seen on the dash cam video laughing in enjoyment as he was amused by the situation him and his fellow defendants had caused.

61. Unknown male Defendant motioned for Kelly to go to the passenger side of the door to harass and antagonize my 2-year-old son.

62. Defendant Kelly said "open the door" as she pulled and tugged on the back passenger door where my son was seated in his car seat.

63. Defendant Kelly began grabbing my son and searching under his car seat and my wife had to advise her to get her hands off our son and to get out of our vehicle. My son had done nothing for her to open my his door and mentally abuse him the way she did. My son was already scared and defendant Kelly furthered that by aggressively entering my vehicle without cause or permission.

64. Because my wife warned defendant Kelly about being near my son, she came back around to the driver's side of the vehicle, stood in front of my wife and started verbally antagonizing her.

65. After an unknown witness walked up and informed Hampton-Bradley that Plaintiff Quincy Blakely was not the suspect, Hampton-Bradley motioned for Gomez Jr. to come over to her police vehicle, and after they had a conversation, Gomez came over to the vehicle I was seated in.

66. Defendant Gomez Jr. then opened the rear passenger door and reached into the vehicle, put his forearm in my neck while in handcuffs behind my back, and cut off my air supply. I raised my body up by pushing up on my feet hitting my head in the rear car window to try to get Gomez Jr forearm out of my throat.

67. It wasn't until I tried to defend myself, did defendant Gomez Jr. release his forearm from my neck and asked me if I tried to bite him. I relied, "If I wanted to bite you, I would have bitten you, and your arm shouldn't have been in my neck." All of this audio was mysteriously removed, or there was distorting noise added to overlap the original sounds.

68. I have a physical disability that has left me with a deformity and screws in my skull from a traumatic brain aneurysm. I begged and pleaded with the defendants and advised them of my medical condition, but only to get the result of constant antagonism and verbal abuse.

69. Because of my self-defense to preservation of life, a cage vehicle

was called over after a hour and a ½ of me sitting in the police vehicle.

70. Defendant Steve Gomez told defendants that I tried to bite him, which was provoked after he put his forearm in my throat while my arms were behind my back, as he cut off my circulation. But I did not bite him.

71. While Gomez Jr. was verbally and physically assaulting me, as I sat handcuffed in the back seat, Defendant Kelly and Defendant Hampton-Bradley ran over to the police vehicle and watched as defendant Gomez Jr. put his forearm in my throat cutting off my circulation.

72. While my wife was still on the phone with my mother-in-law after defendant Gomez Jr. left from physically assaulting me, an unknown male defendant went and snatched Kimberly Blakely's phone away from her.

73. I personally witnessed unknown male Defendant and Defendant Gomez pull my wife from the vehicle with excessive force as defendant Kelly ran over and, hyperextended Kimberly Blakely's arm behind her back while my wife screamed that they were hurting her and to please stop twisting her arm.

74. Defendant Kelly grabbed my wife's left arm and with excessive force twisted it behind her back while my wife screamed "your hurting me, please stop twisting my arm."

75. Defendant Gomez Jr. then left from the driver's side door after assaulting my wife and went and stood in front of the police dash cam to block the view of the excessive force being committed by defendant Kelly and unknown defendant.

76. These defendants committed this abusive assault on my wife in front of my 2yo son sitting in in his car seat as defendant Kelly stated, "she didn't care."

77. Defendant Kelly then searched my wife after my wife repeatedly asked defendant Kelly to stop sexually assaulting her. My wife, Kimberly Blakely advised Kelly that she had already checked her breast 3 times. Defendant Kelly ignored the request and excessively searched my wife's private areas in public as my wife begged and pleaded for her to remove her hands from her private area because she was on her cycle, her touching was offensive, and unknown defendant stated that defendant Kelly can search her as long as she has put gloves on.

78. Defendant Kelly left my wife with her brassier up above her breast in her strapless sun dress. My wife asked defendant Kelly to fix her clothes because her breast were exposed to the public, but defendant Kelly refused.

79. Kimberly Blakely cried, begged, and pleaded that the defendant stop searching between her legs, but the unknown defendant demanded that she open her legs to the excessive demeaning search that ultimately revealed nothing.

80. The indecent exposure/body cavity search was performed on the public street for the many to view in this tourist district.

81. Unknown defendant was advised by defendant Kelly to search Kimberly Blakely's purse and our vehicle, although our vehicle was not being towed, there was no search warrant and there was nothing in our vehicle that would further the investigation of an alleged disturbance inside a restaurant.

82. Unknown defendant searched the vehicle and left the driver's door and passenger door open as people walked by while our 2-year old son was in the vehicle by himself, putting him in harm's way of anyone jumping into the vehicle and driving off or simply taking our son.

83. Kimberly Blakely asked defendant Kelly what she was being arrested for and where she was going, and Kelly replied, "don't worry about it!"

84. While I, Quincy Blakely was being verbally abused by Hampton-Bradley and continuously asking defendants Hampton Bradley, Rojas, Gomez Jr. and Hinojosa to loosen the handcuffs, I tried to adjust myself to keep from passing out and needed to relieve the pressure from my wrists as they had swollen up from the excessive pressure and the heat. I then became verbally agitated because of their refusal to loosen the cuffs and provide me with cool air.

85. I then unbuckled the seat belt as it was digging in my neck and literally cutting off my oxygen. I felt as if I was going to die.

86. During the change to the caged car, Defendant Rojas decided to search me again after sitting in the police vehicle for over an hour and 1/2. Defendant Rojas aggressively and without cause grabbed my testicles and squeezed them tightly as he verbally assaulted me.

87. During the change to the caged vehicle, the defendants Kelly, Hinojosa and Rojas used excessive force by placing my handcuffed arms that were behind my back above my head and shoving me against the police vehicle causing more injury to my wrist, arms, shoulder and chest.

88. Defendant Kelly then came over after talking to defendant Gomez Jr. and questioned what happened. Kelly then shoved me into the caged vehicle hitting my head on the top of the caged vehicles door jam.

89. After gaining control of my body from the excessive force while in handcuffs, I sat in the vehicle, lifted my feet up and turned my body forward where I sat in the caged vehicle, as the defendants maliciously pulled the car right to the front of the restaurant for all who passed by to view. I sat there for an additional 2 hours.

90. I did not arrive to the detention center until 2:30 am, which was more than 3 ½ hours after initial detainment. While continuing to be subjected to their cruel, and unusual punishment.

91. As a result of the 3 ½ hour investigation of a disturbance in

Hattie's restaurant alleged to be committed by my wife and I, I was charged with resisting arrest and unlawful carrying of a weapon. I was fined for assault and theft of service, although witnesses advised that I did not commit any crime and this can be confirmed by the dash cam video which I will tender to this court.

92. Defendant Hampton-Bradley stated to defendant Kelly, just "charge him with everything" after hearing the witness state that it was not me that committed any crime.

93. Plaintiff Kimberly Blakely was not charged with any offense. She was placed in the Dallas City Detention Center for no driver's license. Even thought the defendants were in possession of her DL.

94. Plaintiffs have the certified copy of police video dash cam obtained from the Dallas Police Department of defendant Kelly advising defendant Hampton-Bradley that the witness has said that Plaintiffs were not the individuals that committed the offenses. Defendant Hampton stated to just charge Plaintiff Quincy Blakely anyway and to take Kimberly Blakely wherever.

95. There was nothing named in the complaint that described any force used against said Defendant, Kelly. The complaint simply states that: "Quincy Blakely did then and there intentionally prevent and obstruct J. Kelly……from effecting the arrest or search or transportation of the defendant, by using force against said peace officer." I, Quincy Blakely deny.

96. I, Quincy Blakely deny that I used force against Defendant Kelly, and the false charges against me were done in an effort to justify the use of excessive force and constitutional violations against me, Quincy Blakely and Kimberly Blakely.

97. The arrest for the charge of unlawful carrying a firearm M1461834, was dropped, never filed. The resisting arrest charge M1461834 was dismissed August 21, 2017.

Dkt. No. 15 at 6-20.

## Legal Standards and Analysis

I.    Summary Judgment on Qualified Immunity

### A.    Legal Standards

"A plaintiff makes out a § 1983 claim if he 'shows a violation of the Constitution or of federal law, and then shows that the violation was committed by someone acting

under color of state law,'" *Rich v. Palko*, 920 F.3d 288, 293-94 (5th Cir. 2019) (quoting *Brown v. Miller*, 519 F.3d 231, 236 (5th Cir. 2008); brackets omitted). "But government officials performing discretionary duties" can respond to such a claim by asserting qualified immunity. *Id.* at 294 (citing *Haverda v. Hays Cnty.*, 723 F.3d 586, 598 (5th Cir. 2013)). If they do, a court must consider each official's actions separately. *See, e.g., Meadours v. Ermel*, 483 F.3d 417, 421-22 (5th Cir. 2007).

"Qualified immunity attaches when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam)); *accord Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (per curiam) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011); internal quotation marks omitted); *accord City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 135 S. Ct. 1765, 1774 (2015); *cf. Rich*, 920 F.3d at 294 ("In sum, QI 'represents the norm, and courts should deny a defendant immunity only in rare circumstances.'" (quoting *Romero v. City of Grapevine*, 888 F.3d 170, 176 (5th Cir. 2018))); *Morrow v. Meachum*, 917 F.3d 870, 876 (5th Cir. 2019) (Courts "must think twice before denying qualified immunity.").

Review of a motion for summary judgment based on qualified immunity is accomplished in two steps, and, while a court may conduct the required two-step

examination in any order, *see Pearson*, 555 U.S. at 236, "deciding the two prongs in order 'is often beneficial,'" *Darden v. City of Fort Worth*, 866 F.3d 698, 702 (5th Cir. 2017) (quoting *Pearson*, 555 U.S. at 236).

Regardless which prong is addressed first, a court must decide "whether the facts, taken in the light most favorable to the plaintiff, show the officer's conduct violated a federal constitutional or statutory right." *Luna v. Mullenix*, 773 F.3d 712, 718 (5th Cir. 2014) (citing *Tolan v. Cotton*, 572 U.S. 650, 655-56 (2014) (per curiam); *Flores v. City of Palacios*, 381 F.3d 391, 395 (5th Cir. 2004)), *reversed on other grounds*, 136 S. Ct. 305 (2015). Put differently, under the first prong, a court simply must decide "whether the plaintiff has alleged a violation of a constitutional right." *Charles v. Grief*, 522 F.3d 508, 511 (5th Cir. 2008).

A court must also decide "whether the defendant's actions violated clearly established statutory or constitutional rights of which a reasonable person would have known." *Flores*, 381 F.3d at 395. This second prong of the analysis requires a court to determine "whether the defendant's conduct was objectively reasonable in light of the clearly established law at the time of the incident." *Charles*, 522 F.3d at 511. That is, "whether it would have been clear to a reasonable [official] in the [defendants'] position that their conduct was unlawful in the situation they confronted." *Wood v. Moss*, 572 U.S. 744, 758 (2014) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001); internal quotation marks and original brackets omitted); *see also Mullenix*, 136 S. Ct. at 308 ("[a] clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right'"(quoting

*Reichle v. Howards*, 566 U.S. 658, 664 (2012))).

> This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix*, 136 S. Ct. at 308 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198-99 (2004)). The [United States] Supreme Court does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741 "It is the plaintiff's burden to find a case in [her] favor that does not define the law at a 'high level of generality.'" *Vann v. City of Southaven*, 884 F.3d 307, 310 (5th Cir. 2018) (quoting *Cass v. City of Abilene*, 814 F.3d 721, 733 (5th Cir. 2016)).

*Bustillos v. El Paso Cnty. Hosp. Dist.*, 891 F.3d 214, 222 (5th Cir. 2018) (citations modified).[1]

The Supreme Court recently explained this inquiry in the Fourth Amendment context:

> Where constitutional guidelines seem inapplicable or too remote, it does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness. An officer

---

[1] *See also Morgan v. Swanson*, 659 F.3d 359, 371-72 (5th Cir. 2011) (en banc) (A court "must be able to point to controlling authority – or a robust consensus of persuasive authority – that defines the contours of the right in question with a high degree of particularity." (footnote and internal quotation marks omitted)); *Lincoln v. Turner*, 874 F.3d 833, 850 (5th Cir. 2017) ("While we may look to other circuits to find clearly established law, we must consider 'the overall weight' of such authority. A 'trend' alone is just that. As of December 2013, only two circuits had weighed in on the 'contours of the right.' These cases alone do not provide sufficient authority to find that the law was clearly established." (footnote omitted)); *Bustillos*, 891 F.3d at 222 (holding that the plaintiff failed to shoulder her burden to "point[] ... to any case that shows, in light of the specific context of this case, that the [defendants'] conduct violated clearly established law" and that, although the court's "independent review [ ] uncovered" persuasive authority, "a single, fifty year old case from another circuit is [not] sufficient in this instance to have 'placed the ... constitutional question [at issue] beyond debate'" (quoting *al-Kidd*, 563 U.S. at 741)).

> "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." That is a necessary part of the qualified-immunity standard.

*Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014); reversing denial of summary judgment on a qualified immunity defense); *see also Sause v. Bauer*, 138 S. Ct. 2561, 2562-63 (2018) (per curiam) (reversing dismissal of a *pro se* complaint based on the defendants' entitlement qualified immunity where the district court failed to liberally interpret the Fourth Amendment claims).

"When a defendant asserts qualified immunity, the plaintiff bears the burden of pleading facts that demonstrate liability and defeat immunity." *Shaw v. Villanueva*, 918 F.3d 414, 416-17 (5th Cir. 2019) (citing *Zapata v. Melson*, 750 F.3d 481, 485 (5th Cir. 2014); *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc)); *cf. McLin v. Ard*, 866 F.3d 682, 688 (5th Cir. 2018) ("When the motion to dismiss raises the defense of qualified immunity, the plaintiff 'must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm ... alleged and that defeat a qualified immunity defense with equal specificity.'" (quoting *Zapata*, 750 F.3d at 485 (quoting, in turn, *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012)))).

"Despite this burden-shifting, all reasonable inferences must be drawn in the non-movant plaintiff's favor." *Hyatt v. Thomas*, 843 F.3d 172, 177 (5th Cir. 2016) (citing *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010)).

-14-

That said, a plaintiff's burden at summary judgment "'to rebut a claim of qualified immunity once the defendant has properly raised it in good faith' ... 'is a demanding [one].'" *Mendez v. Poitevent*, 823 F.3d 326, 331 (5th Cir. 2016) (citations omitted).

And the qualified immunity defense is appropriately resolved at the summary judgment stage when (1) a plaintiff has established that the defendant has engaged in the complained-of conduct or (2) the court "skip[s], for the moment, over ... still-contested matters to consider an issue that would moot their effect if proved." *Harlow*, 457 U.S. at 818; *see also Haverda*, 723 F.3d at 599. "If resolution of [qualified immunity] in the summary judgment proceedings turns on what the defendant actually did, rather than on whether the defendant is immunized from liability ..., and if there are conflicting versions of his conduct, one of which would establish and the other defeat liability, then the case is inappropriate for summary judgment." *Haverda*, 723 F.3d at 599 (quoting *Barker v. Norman*, 651 F.2d 1107, 1123-24 (5th Cir. Unit A July 1981)).

Accordingly, a court's qualified immunity inquiry at this stage requires that the Court "accept the plaintiff's version of the facts (to the extent reflected by proper summary judgment evidence) as true." *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 655 (5th Cir. 2004); *see Tolan*, 572 U.S. at 651 ("In articulating the factual context of the case, the Fifth Circuit failed to adhere to the axiom that in ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" (quoting *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 255 (1986))).[2] And, particularly applicable in *pro se* cases, "verified complaint[s] and other verified pleadings serve as competent summary judgment evidence." *Falon v. Holly*, 480 F. App'x 325, 326 (5th Cir. 2012) (per curiam) (citing *Hart v. Hairston*, 343 F.3d 762, 765 (5th Cir. 2003)).

"Although summary judgment may be appropriate based on a plaintiff's inability to prove the facts essential to recovery, this has 'nothing to do with the qualified immunity defense,'" *Haverda*, 723 F.3d at 599 (quoting *Barker*, 651 F.2d at 1124)), as "immunity ... [is] an entitlement distinct from the merits of the case," *Good v. Curtis*, 601 F.3d 393, 397 (5th Cir. 2010) (citation and quotation marks omitted).

### B.    Claims

#### 1.    Excessive Force

"To prevail on a Section 1983 excessive force claim, 'a plaintiff must establish: (1) injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.'" *Shepherd v. Shreveport*, 920 F.3d 278, 283 (5th Cir. 2019) (quoting *Harris v. Serpas*, 745 F.3d 767, 772 (5th Cir. 2014) (quoting, in turn, *Ramirez v. Knoulton*, 542 F.3d 124, 128 (5th Cir.

---

[2] *See, e.g., Mitchell v. Cervantes*, 453 F. App'x 475, 477-78 (5th Cir. 2011) (per curiam) ("Mitchell's allegations in his verified complaint serve as competent summary judgment evidence and suggest a possible constitutional violation. ... Based on Mitchell's proffered facts, the appellants' use of force was not made in a 'good faith effort to maintain or restore discipline' and was not 'nontrivial' but disproportionate to any possible provocation. ... On Mitchell's allegations, as summarized by the district court, the appellants have not shown that their course of conduct was not objectively unreasonable under clearly existing law. Accordingly, they have not demonstrated that they are entitled to qualified immunity as a matter of law." (citations omitted)).

2008)); citing *Graham v. Connor*, 490 U.S. 386, 393-97 (1989)).

To decide whether the Blakelys have shown that the Officer Defendants (or certain of those defendants) violated this constitutional right – the first qualified immunity consideration – the Court should consider that

> [a]ccidental contact between an officer and a civilian is not a Fourth Amendment seizure – even if it injures the civilian – so a § 1983 plaintiff claiming excessive force must show that force was applied intentionally. *See Brower v. Cnty. of Inyo*, 489 U.S. 593, 596-97 (1989) (explaining that a seizure occurs only when a suspect's "freedom of movement" is terminated "through means intentionally applied" by the governmental actor); *Gorman v. Sharp*, 892 F.3d 172, 175 (5th Cir. 2018) (holding there can be no § 1983 liability for excessive force "in the absence of intentional conduct"). And even if the seizure involves intentional conduct, the district court must consider whether it was unreasonable under the specific circumstances of the seizure. *See, e.g., City of Escondido v. Emmons*, 139 S. Ct. 500, 503-04 (2019) (per curiam) (reversing the denial of qualified immunity where officers threw a man to the ground during an arrest).

*McDonald v. McClelland*, 779 F. App'x 222, 225-26 (5th Cir. 2019) (per curiam).

> In excessive-force claims under the Fourth Amendment, the reasonableness of an official's conduct depends on "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The court must adopt "the perspective of a reasonable officer on the scene, rather than [judge] with the 20/20 vision of hindsight." *Id.* "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396-97. "As in other Fourth Amendment contexts, however, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

*Brothers v. Zoss*, 837 F.3d 513, 518-19 (5th Cir. 2016) (footnote omitted).

The Blakelys' verified, non-conclusory allegations supporting their claims of excessive force are that, after Mr. Blakely informed Officers Gomez and Kelly that he "was armed," he "was pulled from [his] vehicle, and pushed onto the police vehicle without making any sudden movements, and without protest" and was then "put into handcuffs and aggressively searched by [Officer] Kelly. At one point during the search, [Officer] Kelly without reason or provocation, grabbed and pulled my testicles after searching my private area more than once." Dkt. No. 15, ¶¶ 45 & 46. He also complained to Officer Kelly that his "handcuffs were too tight, yet my handcuffs were never loosened, in fact, she tightened the handcuffs even more while [Officer Gomez] looked at the dash cam, moved and positioned himself in front of the view of the dash cam as [Officer] Kelly tightened the handcuffs." *Id.*, ¶ 48.

Mr. Blakely further alleges that Officer Gomez "put his forearm in my neck while in handcuffs behind my back, and cut off my air supply." *Id.*, ¶ 66; *see also id.*, ¶ 67. And he alleges that Officers Kelly and Hampton-Bailey observed Officer Gomez's putting "his forearm in my throat cutting off my circulation." *Id.*, ¶ 71.

And Mr. Blakely alleges that, while transferring him between police vehicles, Officer Rojas "aggressively and without cause grabbed my testicles and squeezed them tightly as he verbally assaulted me." *Id.*, ¶ 86; *see also id.*, ¶¶ 87-88 ("During the change to the caged vehicle, [Officers] Kelly, Hinojosa and Rojas used excessive force by placing my handcuffed arms that were behind my back above my head and shoving me against the police vehicle causing more injury to my wrist, arms, shoulder and

-18-

chest. [Officer] Kelly then came over after talking to [Officer Gomez] and questioned what happened. [Officer] Kelly then shoved me into the caged vehicle hitting my head on the top of the caged vehicles door jam.").

As to Mrs. Blakely, Mr. Blakely alleges that he observed at least Officer Gomez pull his "wife from the vehicle with excessive force as [Officer] Kelly ran over and, hyperextended [Mrs.] Blakely's arm behind her back while [she] screamed that they were hurting her and to please stop twisting her arm." *Id.*, ¶ 73; *see also id.*, ¶ 74.

First, although Officer Hampton-Bradley is implicated as a bystander – a separate theory of liability that will be addressed below – only Officers Kelly, Hinojosa, Rojas, and Gomez are alleged to have used any force against either Blakely. The Blakelys have not therefore alleged an excessive force claim against any other defendant, entitling those defendants to qualified immunity as to claims of excessive force. *See, e.g., Meadours*, 483 F.3d at 421-22.

Next, the Blakelys support their opposition to summary judgment with a dash cam video of the incident that they obtained from the Dallas Police Department. *See* Dkt. No. 55 at 15; Dkt. No. 60. The Officer Defendants do not object to this evidence and, in fact, cite the video in their reply. *See generally* Dkt. No. 67. And the undersigned finds that the video could be presented in an admissible form at trial. *See* FED. R. CIV. P. 56(c). So it is proper for the Court to consider it in deciding the motion for summary judgment.

While the Court generally "must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor," *Deville v. Marcantel*,

567 F.3d 156, 164 (5th Cir. 2009) (citation omitted), it must "assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene," *Newman v. Guedry*, 703 F.3d 757, 761 (5th Cir. 2012) (quoting *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011) (citing, in turn, *Scott v. Harris*, 550 U.S. 372 (2007))). Thus, "[w]hen one party's description of the facts is discredited by the record, [a court] need not take his word for it but should view 'the facts in the light depicted by the videotape.'" *Id.* (quoting *Scott*, 550 U.S. at 380-81).

But, here, the dash cam video does not capture all incidents or all aspects of certain incidents alleged in the verified complaint. The video itself is therefore "not dispositive," and, for purposes of the summary judgment motion, the Court should assume that those events captured by the video occurred in the manner depicted by the video but "resolve any remaining factual questions ... in [the Blakelys'] favor." *Davidson v. AT&T Mobility, LLC*, No. 3:17-cv-06-D, 2019 WL 486170, at *2 (N.D. Tex. Feb. 7, 2019); *cf. Brothers*, 837 F.3d at 517 ("The district court ruled that there were genuine disputes as to material facts. The officers urge us to review the genuineness in light of the video evidence and *Harris*'s exception to the jurisdictional limitation. We agree with the plaintiffs, however, that the video evidence does not unequivocally disprove their version of events, which we therefore accept for purposes of this appeal." (footnote omitted)).

While Mr. Blakely submits evidence of physical injuries, an unauthenticated medical report dated October 7, 2014, documenting injuries to his wrist and his complaints of neck and low back pain, *see* Dkt. No. 55 at 12-14, the Blakelys' verified

complaint also asserts "emotional injuries" resulting from the October 3, 2014 encounter, Dkt. No. 15, ¶ 161 ("Defendants conduct has caused physical pain and injury to Plaintiffs. Plaintiffs sustained serious physical and emotional injuries that required medical attention and rehabilitation has been necessary. The Plaintiffs['] injuries are permanent and will require medical attention throughout life. Plaintiffs have also suffered emotional and mental anguish, and pain and suffering as a direct result of the violations of Plaintiffs['] Constitutional Rights.").

"Although a showing of 'significant injury' is no longer required in the context of an excessive force claim, '[the Fifth Circuit] require[s] a plaintiff asserting an excessive force claim to have suffered at least some form of injury.' The injury must be more than a de minimis injury and must be evaluated in the context in which the force was deployed." *Lincoln*, 874 F.3d at 846 (quoting *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001)) And, "[w]hile certain injuries are so slight that they will never satisfy the injury element, *see, e.g., Glenn*, 242 F.3d at 314 (holding that 'handcuffing too tightly, without more, does not amount to excessive force'), psychological injuries may sustain a Fourth Amendment claim." *Id.* (quoting *Flores*, 381 F.3d at 397-98). The Court should therefore find that the Blakelys' have shown the first element of their excessive force claims.

But Mrs. Blakely has not alleged an excessive force claim. While she verifiably alleges that Officer Gomez pulled her from her vehicle and Officer Kelly hyperextended her arm behind her back, the video depicts that Mrs. Blakely was actively resisting arrest and/or not following the officers' instructions. Thus, considering the force used

against Mrs. Blakely in the light depicted by the video, the *Graham* factors weigh in favor of finding that the officers' actions were objectively reasonable in light of the facts and circumstances they confronted. The Court should therefore grant the motion for qualified immunity as to Mrs. Blakely's excessive force claim.

As to Mr. Blakely, it is a close question, but he has shown the remaining elements, to the extent that he verifiably alleges – and the video evidence does not undercut – that Officers Kelly and Rojas unjustifiably grabbed his testicles while he was handcuffed; that Officers Kelly, Hinojosa, and Rojas shoved him against a police vehicle while he was handcuffed; and that Officer Gomez cut off his air supply by placing a forearm against Mr. Blakely's neck while he was handcuffed. While the Officer Defendants have submitted evidence refuting these verified allegations, the allegations are themselves competent summary judgment evidence not clearly controverted by video evidence. So the Court must accept them as true for present purposes and move on the second qualified immunity inquiry – whether Mr. Blakely's right to be free from excessive force in the specific context of the October 2014 incident was "clearly established" at that time.

As the legal standards set out above state, and as the Supreme Court and the Fifth Circuit have recently and "repeatedly stressed" to lower courts, "[t]he 'clearly established' standard [ ] requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' This requires a high "degree of specificity."' *Dist. of Columbia*

-22-

*v. Wesby*, 138 S. Ct. 577, 590 (2018) (quoting *Saucier*, 533 U.S. at 202; *Mullenix*, 136 S. Ct. at 309); *see also id.* ("[C]ourts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" (quoting *Plumhoff*, 572 U.S. at 779)).

Here, this inquiry begins by observing that the Blakelys fail to "point to case law clearly establishing that [the Officer Defendants] acted unreasonably based on facts similar to the particular circumstances they faced," *Hale v. City of Biloxi, Miss.*, 731 F. App'x 259, 264 (5th Cir. 2018) (per curiam), even though it is their burden to demonstrate that the Officer Defendants are "not entitled to qualified immunity," *Valderas v. City of Lubbock*, 937 F.3d 384, 389 (5th Cir. 2019) (per curiam) ("A good-faith qualified immunity defense alters the usual summary judgment burden of proof. Although we view the evidence in the light most favorable to the nonmoving party, the plaintiff bears the burden of demonstrating that a defendant is not entitled to qualified immunity." (citation omitted)); *Vann*, 884 F.3d at 310 ("It is the [plaintiffs'] burden to find a case in [their] favor that does not define the law at a 'high level of generality.'"); *cf. Malcolm v. Vicksburg Warren Sch. Dist. Bd. of Trs.*, 709 F. App'x 243, 246 (5th Cir. 2017) (per curiam) ("[T]he traditional leniency afforded to a *pro se* plaintiff does not excuse [her] from her burden of opposing summary judgment through the use of competent summary judgment evidence." (citing *Davis v. Fernandez*, 798 F.3d 290, 293 (5th Cir. 2015) ("[T]his is not to say that pro se plaintiffs don't have to submit competent evidence to avoid summary judgment, because they do.")))).

> "[S]pecificity is especially important in the Fourth Amendment context, where the [Supreme] Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." Use of excessive force is an area of the law "in which the result depends very much on the facts of each case," and thus police officers are entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue. Precedent involving similar facts can help move a case beyond the otherwise "hazy border between excessive and acceptable force" and thereby provide an officer notice that a specific use of force is unlawful.
>
> "Of course, general statements of the law are not inherently incapable of giving fair and clear warning to officers." But the general rules set forth in "*[Tennessee v. Garner*, 471 U.S. 1 (1985),] and *Graham* do not by themselves create clearly established law outside an 'obvious case.'"

*Kisela*, 138 S. Ct. at 1152-53 (citations omitted); *see also Morrow*, 917 F.3d at 876 ("[O]vercoming qualified immunity is especially difficult in excessive-force cases," as those "claims often turn on 'split-second decisions' to use lethal force. That means the law must be so clearly established that – in the blink of an eye, in the middle of a high-speed chase – every reasonable officer would know it immediately." (citation omitted)).

This is not an obvious case. First, Mr. Blakely admits that he was armed. *See* Dkt. No. 15, ¶ 45. He further admits that he "became verbally agitated" after he was handcuffed. *Id.*, ¶ 84. And the audio of the dash cam video confirms this, especially once officers arrested his wife. Mr. Blakely also admits that, once detained in the police car, he unbuckled his seat belt. *See id.*, ¶ 85. These specifics – that he was armed at the outset of the encounter, which could plausibly justify the aggressive search (including of his testicles); that he was clearly agitated once detained; and that he then

unbuckled his seat belt, which plausibly presents a safety concern for officers and could also plausibly justify his subsequent search before transfer to another police vehicle – remove this case from an obvious case of officers' applying force after a suspect has been handcuffed and is no longer resisting. *Cf. Carroll v. Ellington*, 800 F.3d 154, 177 (5th Cir. 2015) ("The law was clearly established at the time of the deputies' conduct that, once a suspect has been handcuffed and subdued, and is no longer resisting, an officer's subsequent use of force is excessive." (citations omitted)).

Thus, the Court should find that the *Graham* factors are "too general" as applied to the specific facts here because any unlawful conduct "'does not follow immediately from the conclusion that [their application to the specific facts here reflect that an excessive force claim] was firmly established.'" *Wesby*, 138 S. Ct. at 590 (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). And the Court should grant Officers Kelly, Hinojosa, Rojas, and Gomez qualified immunity as to Mr. Blakely's excessive force claim.

In sum, the excessive force claims should be dismissed with prejudice.

2.    <u>False Arrest</u>

An "excessive force claim is separate and distinct from [an] unlawful arrest claim, and [a court] must therefore analyze the excessive force claim without regard to whether the arrest itself was justified." *Freeman v. Gore*, 483 F.3d 404, 417 (5th Cir. 2007) (collecting cases). A separate "constitutional claim for false arrest, which [the Blakelys bring] through the vehicle of § 1983, 'requires a showing of no probable cause.'" *Arizmendi v. Gabbert*, 919 F.3d 891, 897 (5th Cir. 2019) (quoting *Club Retro,*

*L.L.C. v. Hilton*, 568 F.3d 181, 204 (5th Cir. 2009)).

But, here, it is uncontested that the Blakelys were arrested for outstanding warrants. Those warrants "constituted probable cause for [their] arrest in this case," *Muhammad v. Lee*, Civ. A. No. 07-1181, 2007 WL 1068462, at *2 (E.D. La. Apr. 4, 2007) (citations omitted), and their existence defeat this cause of action, *see Smith v. Gonzales*, 670 F.2d 522, 526 (5th Cir. 1982) ("The constitution does not guarantee that only the guilty will be arrested. If it did, section 1983 would provide a cause of action for every defendant acquitted – indeed for every suspect released. Where an arrest is made under authority of a properly issued warrant, the arrest is simply not a false arrest. Such an arrest is not unconstitutional, and a complaint based on such an arrest is subject to dismissal for failure to state a claim." (citations omitted)); *see also, e.g., Fletcher v. City of Jasper*, No. 1:09-CV-977, 2012 WL 5878754, at *1 (E.D. Tex. Nov. 21, 2012) ("As to plaintiff's claims of false arrest/imprisonment, there is no cause of action for false arrest under Section 1983 unless the arresting officer lacks probable cause. As the Magistrate Judge correctly concluded, plaintiff concedes she was arrested pursuant to a warrant." (citation omitted)).

The Blakelys have not therefore shown a constitutional violation for false arrest, the defendants are entitled to qualified immunity on this claim, *see, e.g., Shaw*, 918 F.3d at 416-17; *McLin*, 866 F.3d at 688, and this claim should be dismissed with prejudice.

### 3.  Bystander Liability

It is generally accepted that "an officer who is present at the scene and does not

take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983." *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995) (citations omitted); *accord Peña v. City of Rio Grande City*, 879 F.3d 613, 621 (5th Cir. 2018).

This holding "is consistent with other circuits' determination that an officer may be liable under § 1983 under a theory of bystander liability where the officer '(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.'" *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013) (quoting *Randall v. Prince George's Cnty., Md.*, 302 F.3d 188, 204 (4th Cir. 2002); footnote and citations omitted).

> [First,] a bystanding officer must know of his fellow officer's misconduct. The rationale underlying the bystander liability theory is that a bystanding officer, by choosing not to intervene, functionally participates in the unconstitutional act of his fellow officer. If the bystander lacks such specific knowledge, he cannot be a participant in the unlawful acts, and the imposition of personal liability is impermissible.

*Randall*, 302 F.3d at 204 n.24; *see also Whitley*, 726 F.3d at 646-47 ("[L]iability will not attach where an officer is not present at the scene of the constitutional violation." (footnote and citations omitted)).

But an officer's "mere presence at the scene, without more, does not by some mysterious alchemy render him legally responsible under section 1983 for the actions of a fellow officer." *Calvi v. Knox Cnty.*, 470 F.3d 422, 428 & n.3 (1st Cir. 2006) (further noting, "[t]o be sure, a bystander-officer who has a realistic opportunity to prevent the use of excessive force by a fellow officer may in certain circumstances be held liable for

-27-

a failure to intervene" (citations omitted)); *see also Garrett v. Crawford*, No. SA-15-CV-261-XR, 2016 WL 843391, at *9 (W.D. Tex. Mar. 1, 2016) ("Simply being present at the scene of the alleged use of excessive force, without more, does not give rise to a cognizable claim for failure to intervene. A necessary inquiry in a failure to intervene claim is whether the police officer 'had a reasonable opportunity to realize the excessive nature of the force and to intervene to stop it.'" (citing *Vasquez v. Chacon*, No. 3:08-cv-2046-M, 2009 WL 2169017, at *6 (N.D. Tex. July 20, 2009); quoting *Hale*, 45 F.3d at 919)).

As such, "[a] reasonable opportunity to intercede and prevent the constitutional violation is '[t]he focus of the bystander-liability inquiry.'" *Taplette v. LeBlanc*, Civ. A. No. 18-853-EWD, 2019 WL 1560444, at *6 n.63 (M.D. La. Apr. 10, 2019) (quoting *Malone v. City of Fort Worth, Tex.*, No. 4:09-cv-634-Y, 2014 WL 5781001, at *16 (N.D. Tex. Nov. 6, 2014)). And, "[i]n resolving whether a plaintiff has sufficiently alleged a bystander liability claim [courts] also consider whether an officer 'acquiesce[d] in' the alleged constitutional violation." *Whitley*, 726 F.3d at 647 (citations omitted); *see Peavy v. Dallas Indep. Sch. Dist.*, 57 F. Supp.2d 382, 390 n.4 (N.D. Tex. 1999) ("In *Hale*, the court held, pursuant to longstanding Fifth Circuit precedent, that a police officer had a duty not to acquiesce in another officer's use of excessive force by refusing to take measures to stop the use of such excessive force.").

"In making the determination of whether or not an officer acquiesced to the excessive force, courts consider the duration of the alleged use of force and the location of the suspect in relationship to the observing officer." *Garrett*, 2016 WL 843391, at *9

(citing *Malone*, 2014 WL 5781001, at *15-*16). This determination turns on the facts alleged in the complaint and the reasonable inferences that may be drawn from those facts. *See, e.g., id.* at *9-*10 (comparing the facts there to the those alleged in *Robinson v. City of Garland, Tex.*, No. 3:10-cv-2496-M, 2015 WL 9591443 (N.D. Tex. Nov. 23, 2015), *rec. adopted*, 2015 WL 9593623 (N.D. Tex. Dec. 31, 2015), and *Dwyer v. City of Corinth, Tex.*, No. 4:09-CV-198, 2009 WL 3856989 (E.D. Tex. Nov. 17, 2009)); *see also Douglas v. DePhillips*, Civ. A. No. 17-2305, 2017 WL 4574422, at *11 (E.D. La. Oct. 13, 2017) ("Given the alleged speed with which the incident unfolded, the factual allegations cannot be reasonably construed to support the inference that Deputies Kelly and Jenkins 'acquiesced in the alleged use of excessive force.'" (quoting *Hale*, 45 F.3d at 919)).

Here, the Blakelys' verified allegations lack the factual specificity to make out a bystander liability claim against any single officer, which therefore defeats an excessive force claim based on this theory and requires the Court to grant qualified immunity to any officer the Blakelys' attempt to hold liable based on bystander liability. *See, e.g., Shaw*, 918 F.3d at 416-17; *McLin*, 866 F.3d at 688.

Separately, for the reasons that the Court should grant qualified immunity for Mr. Blakely's excessive force claim, under the clearly-established prong of the analysis, the Court should grant qualified immunity on any derivative bystander liability claim. *Cf. Brooks v. Brown*, 94 F.3d 655 (table), 1996 WL 460048, at *3 (10th Cir. Aug. 14, 1996) ("[O]ur conclusion that officers Korkowski and Brown did not use excessive force forecloses any derivative claim that Rasmussen and Wilson could be liable for failing

to intervene on plaintiff's behalf." (citation omitted)).

In sum, the Court should dismiss this claim with prejudice.

4.     Property Seizure

Mr. Blakely further alleges that at the time he was his arrested officers seized his personal property, including his handgun and handgun license. The uncontroverted facts reflect that this property was seized incident to an arrest that was lawful (for the reasons explained above). And Mr. Blakely alleges no facts to support a claim that he has requested the return of his property and officials have refused that request. Such a refusal, moreover, would likely not implicate the Officer Defendants. *See, e.g., Hahn v. City of Kenner*, 984 F. Supp. 424, 430 (E.D. La. 1997) ("[F]or Chief Congemi's alleged intervention regarding the gun to be a Section 1983 violation, Hahn must show that this deprivation violated his Fourteenth Amendment property interest. Where the government *permanently* deprives plaintiff of his even lawfully seized personal belongings, plaintiff's due process property interest is implicated, and a Section 1983 claim arises. 'The general rule is that seized property, other than contraband, should be returned to its rightful owner once the criminal proceedings have terminated.' Had the City or Chief Congemi permanently denied Hahn his gun, Hahn may well have a Section 1983 claim." (citing *Matthias v. Bingley*, 906 F.2d 1047, 1050 (5th Cir.), *modified on other grounds*, 915 F.2d 946 (5th Cir. 1990); quoting *Cooper v. City of Greenwood, Miss.*, 904 F.2d 302 (5th Cir. 1990))).

The Blakelys have not therefore shown a constitutional violation as to this claim, the defendants are entitled to qualified immunity on this claim, *see, e.g., Shaw*, 918

-30-

F.3d at 416-17; *McLin*, 866 F.3d at 688, and this claim should be dismissed with prejudice.

     5.    <u>Child Endangerment and Injury to Disabled Person</u>

The remaining claims – that the defendants endangered the Blakelys' child when they were arrested and that the defendants knowingly caused Mr. Blakely harm after he told them he had a traumatic brain injury, *see* Dkt. No. 15, ¶¶ 111-14 – are only supported by verified allegations that are conclusory. Such allegations do not state a constitutional violation. The defendants are therefore entitled to qualified immunity, *see, e.g., Shaw*, 918 F.3d at 416-17; *McLin*, 866 F.3d at 688, and the Court should dismiss these claims with prejudice.

II.    <u>Motion to Dismiss</u>

Officer Hinojosa moves to dismiss all claims asserted in this action, those claims addressed above and those claims the Court previously dismissed. *See Blakely*, 2019 WL 2013808.

For the reasons discussed above, Officer Gomez is entitled to qualified immunity on Mr. Blakely's excessive force claim. The Blakelys otherwise fail to allege claims against any defendant.

The Court should therefore grant Officer Hinojosa motion to dismiss.

## Recommendation

The Court should grant the motion for summary judgment filed by Officers Steve Gomez, Jr., Pamela Hampton-Bradley, Francisco J. Mireles, Fidel Padron, Robert Ramsey, Pablo Rojas, and Fernando Silva as to their entitlement to qualified immunity

[Dkt. No. 38], grant Officer Jesus Hinojosa, Jr.'s motion to dismiss [Dkt No. 41], and dismiss with prejudice all claims asserted by Plaintiffs Quincy Demond Blakely and Kimberly Blakely.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: January 21, 2020

_____

DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE